MEGHAN BLANCO (238171)
LAW OFFICES OF MEGHAN BLANCO
　　28202 Cabot Road, Suite 300
　　Laguna Niguel, California 92677
　　Telephone:　(949) 296-9869
　　Facsimile:　(949) 606-8988
　　E-mail:　mblanco@meghanblanco.com

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>　　　　v.<br><br>MOUSTAPHA MOUSTAPHA,<br><br>　　　　Defendant. | No. CR 24-CR-168-MCS<br><br>MOTION TO SUPPRESS ITEMS SEIZED DURING UNLAWFUL SEARCH |

　　　PLEASE TAKE NOTICE that on August 13, 2024, or as soon thereafter as counsel may be heard, in the Courtroom of the Honorable Mark C. Scarsi, United States District Judge, defendant Moustapha Moustapha will bring on for hearing the following motion to suppress.

　　　This motion is based on the attached Memorandum of Points and Authorities, Exhibits and Declarations, the

1

application to shorten time, the complete file, and any argument or evidence presented at a hearing on the matter.

Respectfully Submitted,

Dated: August 8, 2024

                            *//s// Meghan Blanco*
                            MEGHAN BLANCO
                            COUNSEL FOR DEFENDANT

MEMORANDUM OF POINTS AND AUTHORITIES

I. Introduction and Facts

On February 1, 2024, the government submitted a warrant application seeking authorization to search Mr. Moustapha and his residence in Malibu. Shortly after lunch, agents "set up surveillance" at the Malibu residence in preparation for the search. Less than a half hour later, still without a warrant, rookie DEA SA West, who appears to be the primary investigator in the case, directed "agents [to] approach[] the Target Residence to attempt to speak with and gain consent to search from MOUSTAPHA." A group of agents knocked on the front door of the residence. Before anyone answered, they loudly announced that they were "law enforcement." *See* Exhibit A.

Artur Gevorg, who was visiting the family that day, answered. Agents pulled Artur outside to interrogate him. Moustapha's wife, Hiba, then came to the door. Agents asked her for consent to enter. When she said no, one of the agents, without judicial authorization or legal justification, directed the group to "expedite the operation and enter[] the residence and conduct[] a safety sweep of the Target Residence." *Id*. Agents used physical force to pull Hiba onto the front porch with her sick, six-year-old daughter by her side. *See* Declaration of Hiba Salem. Then they entered the residence with guns

3

drawn. They made their way to the lower portion of the house, where Hiba's mom was napping.

Agents forcefully broke into her room and pointed their guns at her as she slept in her bed. They directed her to stand up, pressed a gun against her back, and pushed her in front of them, at gun point, as they continued to search the residence, using her as a human shield as they entered each room. Terrified and confused, she pleaded with them to let her go.

Agents claim they did not conduct a "search of the Target Residence" until after a search warrant was obtained. However, their legal characterization of their actions is wrong. A rose by any other name smells as sweet. Immediately upon entering the residence, agents conducted a thorough search of each room within the residence. They opened and searched drawers, closets, containers, luggage and a purse. Approximately $4000 was removed from Ms. Salem's carry-on luggage. As they rummaged through the contents of the house, agents joked about "smelling drugs." None of the remaining occupants were allowed to leave, freely walk around the house, talk to each other, or use their phones unless an agent approved and monitored their phone use. They would not allow Hiba to leave the residence to pick up her 12-year-old son from school. Nor would they allow her to call a babysitter to pick him up until she agreed to allow her

4

phone use and conversation to be monitored. Agents held the telephone while she made the call.

The government's unlawful search of the residence and detention of its occupants continued for hours, long after the residence had been cleared and its occupants, including a six-year-old girl, detained. At approximately 5:00 p.m., an agent returned with a warrant and seized several items from the residence. They also arrested Hiba, although they released her without charges after they booked her into a county jail and seized her phone.

At the conclusion of their search, the government claimed that Moustapha was a "DEA fugitive wanted on a probable cause arrest." However, at no point prior to his arrest was Moustapha an actual fugitive. This is because DEA agents never applied for a warrant to arrest him. Nor did they file a criminal complaint against him. Instead of doing either of these things,[1] which, if granted, may have allowed agents to lawfully enter a residence to

---

[1] On February 6, 2024, SA West transported several cellular telephones he seized on February 1 to a "LAFD Tech Specialist Jimmy Huang." The phones were then returned to the DEA evidence locker weeks later, on February 22. It appears that the government likely conducted searches of these devices during that time. However, between February 1 and February 22, agents never obtained a warrant to search any of the devices seized on February 1. The contents of the telephones have not been produced to defense counsel; nevertheless, the government's actions in searching the devices are still illegal. If agents did illegally search any device seized in this case, the government has a duty to memorialize that illegal conduct and discover the information to defense counsel. To date, this has not occurred.

effectuate an arrest, on February 12, 2024 – twelve days after agents unlawfully entered and searched the Malibu residence – agents lied to AUSA Scott in an effort to gain permission to enter Moustapha's apartment, without a warrant. Specifically, SA Shaffer told AUSA Scott that agents knew where Moustapha lived and had obtained consent to enter the residence from the person whose "name" appeared on the apartment's lease. This was a blatant lie. *See* Exhibit B. Agents never obtained consent from the named lessee; they obtained consent from the named lessee's brother, whom they knew did not live at the residence. AUSA Scott, seemingly acting in good faith on SA Scaffer's patently false representation, authorized agents to enter Mr. Moustapha's apartment, without a warrant, to arrest him.

II. Argument

A. Agents Illegally Entered the Residence

The Fourth Amendment of the United States Constitution asserts: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., Amend. IV)

6

A search and seizure without a warrant is presumptively illegal and must be justified by the prosecution. The prosecution bears the burden of establishing the legality of a warrantless search and seizure. "It is hornbook law that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment's warrant requirement unless they fall within one of a few narrow exceptions thereto." *Coolidge v. New Hampshire* (1971) 403 U.S. 443, 454-455; see also *Minley v. Arizona* (1978) 437 U.S. 385, 390. Further, when law enforcement officers conduct a warrantless search and seizure, the prosecution has the burden of justifying the action under a recognized exception to the constitutional warrant requirement. *Welsh v. Wisconsin* (1984) 466 U.S. 740, 749-750.

Here, the government cannot justify agents' entry into Mr. Moustapha's residence. Agents sought a warrant, but when they grew impatient with the time it took the court to review the warrant application, they opted to plow ahead without one.

The fact that agents initially asked Ms. Salem for consent to enter belies their post hoc claim that an "exigency" existed. If they truly believed that there were exigent circumstances to enter the residence, they would not have sought consent to enter.

7

The evidence demonstrates that the agents subjectively did – just as any reasonable officer objectively would – know that they had no legal right to enter the residence without consent or a warrant. Their attempted use of Ms. Salem's refusal to provide consent as justification to search, is simply illogical.

Under the government's post hoc rationale, they can simply ask a resident for consent to enter any property, and then when the resident declines, use that refusal as legal justification to go in anyway. Such logic, if sanctioned by the Court, would turn the Fourth Amendment on its head and would effectively eliminate the warrant requirement. "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.'" *Welsh v. Wisconsin*, 466 U.S. 740, 748 (19840.

B. Once they Illegally Entered the Residence, Agents Conducted an Illegal Search of It

Once inside, agents conducted a search of the residence under the guise of a "protective sweep." Since they were not authorized to enter the residence, any protective sweep would be unreasonable and in violation of the Fourth Amendment.

However, the government's post hoc characterization of its search of the residence without a warrant as a "protective sweep," is incorrect.

8

In *Maryland v. Buie*, the Supreme Court recognized that, in very limited circumstances, officers may conduct "protective sweep" without a warrant. *Maryland v. Buie*, 494 U.S. 325 (1990). In *Buie*, the defendant and another man robbed a restaurant. One of the robbers was wearing a red jogging suit. Police obtained an arrest warrant for the defendant and executed it at his house. There, one officer shouted into the basement for everyone to come up. When the defendant did so, he was promptly arrested. Another officer then entered the basement 'in case there was someone else' down there. In plain view the officer saw a red jogging suit, which he seized. Charged with the restaurant robbery, the defendant moved to suppress the jogging suit. The trial court denied the motion. That ruling was overturned by the Maryland Court of Appeals, that state's highest tribunal, which invalidated the search because the officers lacked probable cause to search the basement. That decision, in turn, was vacated by the United States Supreme Court, which concluded that the probable cause standard did not apply to a 'protective sweep.' The court explained that as incident to an arrest 'the officers could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched.' But it stressed that beyond that, an inspection undertaken

9

outside the immediate area of the arrest must be supported by 'articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."

Here, agents searched the residence for hours, without making an arrest or obtaining a warrant. They looked inside bags, closets, cabinets and drawers, including in areas they believed they would find contraband. They continued to search for hours *after* the residence had been cleared and all its occupants detained. As they did this, one agent even joked about his discovery of drugs by saying he "smelled [them]" as he handled a box containing narcotics.

C. Agents Lied to Gain AUSA Permission to Illegally Enter the Marina Del Rey Apartment to Arrest Him

Twelve days after illegally entering and searching Mr. Moustapha's residence, agents continued their course of illegal conduct by lying to AUSA Scott to obtain his permission to enter a different residence they believed Mr. Moustapha was staying in. On February 12, 2024, agents determined that Mr. Moustapha was staying in an apartment in Marina Del Rey. They spoke to the lessee's brother, who did not live at the residence, and asked for consent to enter the residence, which he gave. However,

10

they falsely told the AUSA that the lessee – not the lessee's brother – agreed to allow agents to enter the residence.  Based on this false representation, AUSA Scott authorized a warrantless entry.

At the time agents entered the Marina Del Rey residence, they had not sought a warrant to arrest Mr. Moustapha and had no legal authority to enter the residence without a valid warrant or valid consent.  Instead of taking the required steps to enter the residence lawfully, they acted in willful violation of Mr. Moustapha's constitutional rights and of their duty of candor to the AUSA by falsely stating they obtained consent to enter the residence from the lessee.[2]  Accordingly, all facts surrounding Mr. Moustapha's illegal arrest should be suppressed.

//
//
//
//
//
//
//
//

---

[2] Interestingly, they did not appear to contact the AUSA when they attempted to gain Ms. Salem's consent the Malibu Residence.  Nor did they appear to contact the AUSA when they illegally entered and searched the Malibu Residence February 1, 2024.

11

## III. Conclusion

For the foregoing reasons, Mr. Moustapha respectfully requests that the Court suppress all evidence seized on February 1, 2024, and all facts surrounding his illegal arrest on February 12, 2024.

Respectfully Submitted,

Dated: August 8, 2024

                              *//s// Meghan Blanco*
MEGHAN BLANCO
COUNSEL FOR DEFENDANT
MOUSTAPHA MOUSTAPHA