E. MARTIN ESTRADA
United States Attorney
CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division
DAVID C. LACHMAN (Cal Bar. 261711)
COLIN S. SCOTT (Cal Bar. 318555)
Assistant United States Attorneys
Terrorism and Export Crimes Section
    1300 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-5564/3159
    Facsimile: (213) 894-2927
    E-mail:    david.lachman@usdoj.gov
               colin.scott@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>             Plaintiff,<br><br>             v.<br><br>MOUSTAPHA MOUSTAPHA,<br><br>             Defendant. | No. CR 24-00168-MCS<br><br>GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS EVIDENCE<br><br>Hearing Date: August 12, 2024<br>Hearing Time: 3:00 p.m.<br>Location:    Courtroom of the<br>             Hon. Mark C. Scarsi |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorneys David C. Lachman and Colin S. Scott, hereby files its Opposition to Defendant's Motion to Suppress Evidence (Dkt. Entry No. 21).

This Opposition is based upon the attached memorandum of points and authorities, the declarations of Colin Scott, Trenton Shaffer, and Gerald West, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: August 11, 2024          Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division

          /s/
DAVID C. LACHMAN
COLIN S. SCOTT
Assistant United States Attorneys

Attorneys for Plaintiff
UNITED STATES OF AMERICA

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

When federal agents executed a federally authorized search of defendant Moustapha Moustapha's ("Moustapha" or "defendant") Malibu beach house on February 1, 2024, they found 200 pounds of methamphetamine, approximately a kilogram of cocaine, and eight firearms.  Defendant fled the house before agents could apprehend him, escaping through a back door.  Agents only located and apprehended defendant 12 days later, after receiving permission from the renter of an Airbnb apartment where defendant was hiding to enter the apartment.  Defendant again attempted to evade arrest, biting one federal agent and injuring another.  Now, in a last-ditch attempt weeks after this Court's motion deadline, defendant seeks to suppress the evidence seized during the search and the facts surrounding his arrest.

Defendant's motion is meritless. First, agents did not unlawfully search defendant's Malibu residence because: (1) law enforcement agents did not search the residence before receiving the signed search warrant; (2) although agents conducted a limited protective sweep of the premises prior to obtaining the warrant, they were entitled to do so to secure the premises in anticipation of the warrant being signed; and (3) the federal search warrant here was based entirely on facts known before agents arrived at defendant's residence and conducted the protective sweep and eventual search. Indeed, the warrant application was filed more than an hour before agents arrived at defendant's residence. Second, federal agents obtained consent to enter the Airbnb apartment where Moustapha was

hiding by an individual with apparent authority over the Airbnb rental, and in any event, there is nothing to suppress.

**II. STATEMENT OF FACTS[1]**

    **A. Agents Identify Defendant as an International Drug Trafficker**

The search of defendant's home stems from an investigation by the Drug Enforcement Administration ("DEA") into the shipment of large quantities of methamphetamine and cocaine from Los Angeles to Australia. In November of 2023, a reliable confidential informant (the "CI") told DEA Special Agent Gerald West that the defendant was an international drug trafficker operating in the Los Angeles area. (Declaration of Gerald West ("West Decl.") at 2.) Based upon this information, as well as corroborating information provided by Australian authorities, DEA began a deeper investigation into defendant and his narcotics trafficking organization. Using a combination of GPS location data and physical surveillance, law enforcement agents identified 19936 CA-1, Malibu, CA 90265 (the "Malibu Beach House") as defendant's residence in January 2024.

On January 30, 2024, the CI provided Special Agent West with video recordings of the defendant inside the Malibu Beach House, which Special Agent West recognized from physical surveillance. (West Decl. at 3). The videos depicted several packages that resembled drug shipments seized by Australian law enforcement. (Id.)

---

[1] Defendant's motion and the declaration of Hiba Salem are filled with spurious inaccurate descriptions designed to shock the reader. None of which are legally relevant in deciding this motion. The government has provided the legally relevant facts but is willing to provide a more fulsome accounting of the search if the court desires. The only legally relevant fact is whether agents had a federal warrant supported by probable cause to search the premises.

The CI also told Special Agent West that there were approximately 50 similar packages inside the Malibu Beach House containing approximately 50 kilograms of drugs. Based upon other information provided by the CI, Special Agent West believed that Moustapha also had firearms in the residence. (Id. at 4.)

### B. Agents Obtain a Warrant, Search Defendant's Malibu Beach House, and Find Over 200 Pounds of Methamphetamine

Based on the information described above, at 11:52 a.m. on February 1, 2024, the government submitted an application for a search warrant to Magistrate Judge Choolijian to search the Malibu Beach House. (Declaration of Colin Scott ("Scott Decl."), Ex. A.) At approximately 1:33 p.m., in anticipation of obtaining the signed search warrant, and fearful of the dissipation of the substantial quantities of methamphetamine shown in the videos the CI sent to the agent the day before, agents established surveillance at the Malibu Beach House. (Dkt. 21-2 at 5.) During their surveillance, agents saw a man, later identified as Artur Gevorg, enter the residence carrying a large backpack. The man exited the residence, retrieved something from a BMW, and re-entered the residence.

At approximately 2:00 p.m., out of concern that Gevorg could be transporting contraband, the agents approached the Malibu Beach House and announced their presence to try to locate and speak with the defendant. No one responded for approximately 10 minutes. At that point, Gevorg came to the door and, in response to questioning, gave inconsistent answers as to whether the defendant was present. A short while later, defendant's wife, Hina Salem, also came to the door. She too gave inconsistent answers regarding whether the defendant was at home. Due to their prior knowledge that defendant

had firearms, the time in between the agents announcing their presence and someone answering the door, and the evasive answers about the defendant's whereabouts, agents believed that he could be arming himself and that Gevorg could be moving or disposing of evidence, agents decided to freeze the premises and conduct a safety sweep of the home.  (West Decl. at ¶ 6).

During the protective sweep, agents observed that the balcony door to the main bedroom, leading to the beach, was open.  After completing the sweep and failing to find the defendant, agents searched the beach.  A few surfers pointed south, and agents saw a heavy-set, bald man resembling the defendant running south along the beach and then jump into the ocean.  The agents, however, were unable to locate defendant, who evaded arrest for more than a week.

### C. The Search

Magistrate Judge Choolijian signed the search warrant at 3:00 p.m. (Ex. A.)  At approximately 4:47 p.m., agents began a search of the Malibu Beach House.  During the search, agents found:

- Approximately 200 pounds of methamphetamine;
- A kilogram of cocaine;
- Eight firearms (including a ghost gun and a stolen firearm);
- Ammunition; and
- Drug paraphernalia, including a digital scale and packaging materials.

(West Decl. at ¶ 7.)

### D. Agents Find and Arrest Defendant Twelve Days Later in an Airbnb Rental Apartment

On February 6, 2024, law enforcement obtained a federal warrant for the geolocation data of a new phone number used by the defendant.

6

Based upon this data, agents located defendant on February 12, 2024, driving in a white Tesla with two other men in the Marina Del Rey area. Law enforcement agents, including Special Agent Trenton Shaffer, questioned the two men who they saw in the Tesla with the defendant. One of the men identified himself as the lead cook at a restaurant in Los Angeles frequented by the defendant (hereinafter "the Cook." The Cook told law enforcement that the defendant had appeared at his restaurant with wet clothes on the night of February 1, 2024, after the execution of the search warrant at the Malibu Beach House. Moustapha asked the Cook to lend him money and give him a place to stay. The second individual, Abuadwad, told law enforcement that the Cook and Moustapha hired him as an Uber driver and then offered him $600 a day to drive them around.

The Cook told law enforcement that he knew where Moustapha was staying because he had booked an Airbnb apartment for Moustapha. (Declaration of Trenton Shaffer ("Shaffer Decl.") at ¶ 2). The Cook gave law enforcement the address of this property in Marina Del Rey and told law enforcement they could enter at any time to arrest Moustapha. (Id. at ¶ 3)

That night, with the Cook's approval and the gate code he provided, law enforcement entered the Airbnb apartment and arrested Moustapha. (Shaffer Decl. at ¶ 3). During the arrest, Moustapha violently resisted, assaulting two of the agents, biting one, and requiring both agents to seek medical attention. (Id. at ¶ 4).

**III. ARGUMENT**

    **A. The Search of the Malibu Beach House Was Conducted Pursuant to a Valid Warrant**

        1. <u>The Government Applied for and Received a Warrant Before Searching the Malibu Beach House.</u>

Searches not performed pursuant to a warrant are presumed to be unreasonable. <u>Kentucky v. King</u>, 563 U.S. 452 (2011). However, a search pursuant to a warrant should be presumed to be valid, as the affidavit supporting a search warrant enjoys a presumption of validity. <u>Franks v. Delaware</u>, 438 U.S. 154, 171 (1978). Here, agents applied for a federal warrant to search the Malibu Beach House at 11:52 a.m. and obtained the warrant at 3:00 p.m. on February 1, 2024. (Scott Decl., Ex. A.) Although agents conducted a protective sweep of the premises about an hour before receiving the signed warrant, they did not begin searching the house until 4:47 p.m. (West Decl. ¶¶ 6-7.) This timeline is corroborated by the metadata on a video filmed by Special Agent West which shows the state of the premises before the search began. The pre-search video was filmed at 4:47 p.m. on February 1, 2024. (<u>Id.</u> at ¶ 9). A second video, showing the state of the premises after the search had concluded, was filmed at 6:41 p.m. on February 1, 2024. (<u>Id.</u> at ¶ 10). Defendant's contention that the search occurred before agents obtained a warrant is belied by the video evidence. Defendant's argument is also undermined by the metadata for the photos from the search warrant which indicate they were taken after 4:47 p.m. (<u>Id.</u> at ¶ 11.)

        2. <u>The DEA Was Justified in Freezing the Premises While Waiting for the Search Warrant to Be Signed</u>

The securing of a premises while officers obtain a search

warrant for the premises is a Fourth Amendment seizure. <u>United States v. Lindsey</u>, 877 F.2d 777, 780 (9th Cir. 1989). However, when officers have probable cause to believe that contraband is contained in a particular residence and have a reasonable belief that if the residence is not immediately secured the evidence will be destroyed, officers may enter the residence to secure it pending the issuance of a search warrant. <u>United States v. Alaimalo</u>, 313 F.3d 1188, 1192-93 (9th Cir. 2002); <u>Dixon v. Wallowa County</u>, 336 F.3d 1013 (9th Cir. 2003). Additionally, the protective sweep doctrine authorizes quick and limited warrantless inspections of those spaces where a person may be found when there are articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbor[ed] an individual posing a danger to those on the scene. <u>United States v. Lemus</u>, 582 F.3d 958, 962 (9th Cir. 2009).

  Here, before arriving at the Malibu Beach House, agents had probable cause that the residence contained drugs, which are easily disposable, and firearms, which present a danger to officers. (West Decl. ¶¶ 2-4.) The agents also understood that the defendant was preparing to ship the narcotics. (<u>Id.</u>) While conducting surveillance in anticipation of receiving the signed search warrant, agents saw an unidentified man enter, exit, and reenter the house carrying a large backpack. (Dkt. 21-2 at 5.]) When they announced their presence at the door, no one responded for approximately 10 minutes, and when the man and defendant's wife finally responded, they both gave evasive and inconsistent answers as to defendant's whereabouts. (<u>Id.</u>) Based on these observations, and their belief that the defendant was potentially inside the house with the drugs

9

and the firearms, agents were justified in conducting a protective sweep and freezing the premises while they waited for the signed warrant.

### 3. Even if the Protective Sweep Were Invalid, the Court Should Not Suppress the Government's Evidence

Even assuming that the agents' entry and protective sweep of the home was invalid, the warrant was supported by probable cause developed prior to and independent of any improper entry. Segura v. United States, 468 U.S. 796, 806 (1984). The clearest indication that the search warrant was not tainted by any supposedly illegal search is that the government submitted the warrant application at 11:52 a.m. on February 1, 2024, hours before the protective sweep began. (Scott Decl., Ex B.) Because the government would have obtained the untainted search warrant is an "independent source" of the evidence seized from the Malibu Beach House, the exclusionary rule does not apply.

"Evidence obtained as a product of illegal searches and seizures" is "'fruit of the poisonous tree'" and warrants "application of the exclusionary rule if, 'granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality[.]'" United States v. Crawford, 372 F.3d 1048, 1054 (9th Cir. 2004) (citation omitted). Thus, application of "[t]he exclusionary rule requires a causal connection between the illegal conduct and the evidence sought to be suppressed." Id. However, even where that causal connection exists, courts have recognized "several exceptions to the rule." Utah v. Strieff, 579 U.S. 232, 238 (2016). Among these exceptions, "the inevitable discovery doctrine allows for the admission of

10

evidence that would have been discovered even without the unconstitutional source." Id.; United States v. Ramirez-Sandoval, 872 F.2d 1392, 1396 (9th Cir. 1989) (the inevitable discovery exception "allows the introduction of illegally obtained evidence if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means").

"To determine whether [a] warrant" is "independent of [an] illegal entry," courts consider whether the warrant "would have been sought even if what actually happened had not occurred[.]" Murray v. United States, 487 U.S. 533, 542 n.3 (1988). In other words, if law enforcement would have sought and successfully obtained a warrant even if the illegal entry had never occurred, then there is an "independent source" for the warrant, as well as the evidence obtained pursuant to the warrant. See id. at 541-42; United States v. Saelee, 51 F.4th 327, 335 (9th Cir. 2022).[2]

Here, even assuming that agents searched the Malibu Beach House before obtaining the warrant -- which they did not -- the warrant was completely independent of any alleged illegal entry. The affidavit in support of the warrant contained detailed information establishing that large quantities of drugs were likely at the premises, which Special Agent West received from the CI on January 30, 2024. (Scott. Decl., Ex. A.) The warrant also included substantial information corroborating defendant's involvement in international drug

---

[2] Even when observations made during an illegal entry are used in the warrant affidavit, those portions may be excised from the affidavit and the remainder then retested for the existence of probable cause; if the warrant is still supported by probable cause, then the search will be upheld. United States v. Nora, 765 F.3d 1049, 1058 (9th Cir. 2014).

11

smuggling, including evidence that Australian authorities had found defendant's fingerprints on drug shipments from the United States that and text messages with between defendant and his associates discussing international narcotics smuggling. (Scott Decl., Ex A. at 28) This information predated the day of the search, and the warrant application itself was submitted to the magistrate judge <u>before</u> agents conducted the purportedly illegal sweep. (Scott Decl., Ex B.) Because the search warrant application relied on information that was entirely independent of anything the agents might have learned during the protective sweep, there is no basis to suppress any of the evidence found in the Malibu Beach House. Accordingly, defendant's motion to suppress should be denied.

     B.    **Law Enforcement Had the Apparent Consent of the Lessee of the Airbnb Where the Defendant Had Fled**

Defendant's arguments that his arrest was invalid because agents did not obtain an arrest warrant or have permission to enter the Airbnb apartment where he was found do not fare any better. <u>First</u>, as to the absence of an arrest warrant, the law allows for warrantless arrests provided that they are supported by probable cause. <u>Michigan v. Summers,</u> 452 U.S. 692 (1981). Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. <u>Beck v. Ohio</u>, 379 U.S. 89, 91 (1964). Here, the more than 200 pounds of methamphetamine and kilogram of cocaine seized from defendant's residence provided ample probable cause to arrest him on drug trafficking charges. In addition, defendant's flight on the day of the execution of the search warrant added additional

12

probable cause supporting his arrest. Illinois v. Wardlow, 529 U.S. 119, 124 (2000) ("Headlong flight — wherever it occurs — is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such.").

Second, as to the agents entry into the Airbnb apartment where the defendant was hiding, defendant himself admits that the agents "obtained consent from the named lessee's brother," the Cook who spoke with law enforcement, before entering the apartment. (See Mot. at 6). The Cook told the arresting agents that he had rented and paid for the Airbnb, gave them the door code, and expressly gave them permission to enter.[3] The Cook used his brother's Airbnb account (and not his own) to rent the apartment is of no legal significance; all that is required is "joint access and control." United States v. Fultz, 146 F.3d 1102, 1105 (9th Cir. 1998). Accordingly, the agents had express authority to enter the Airbnb apartment to arrest the defendant.

Even assuming that the agents did not have express authority, they reasonably relied on the Cook's apparent authority as the renter of the apartment. Illinois v. Rodriguez, 497 U.S. 177, 186–89 (1990); see also United States v. Waits, 285 F. App'x 465 (9th Cir. 2008) (finding apparent authority existed where person authorizing search told officers that he was the defendant's roommate, gave the officers the impression that he had a key, and brought them to the unlocked front door). Apparent authority is measured by an objective standard of reasonableness, and requires an examination of the actual consent as well as the surrounding circumstances. United States v.

---

[3] Special Agent Trenton Shaffer later learned that the Cook had rented the Airbnb using his brother's account. (Shaffer Decl. at 2.)

13

Ruiz, 428 F.3d 877, 881 (9th Cir. 2005). Here, the fact that the Cook knew the combination code to unlock the door, willingly provided that code to the agents, and told them that he both rented and paid for the Airbnb apartment made their reliance on his permission eminently reasonable.

Finally, even if agents lacked authority to enter the Airbnb apartment -- which they did not -- defendant cannot suppress the fact of his arrest. As the Supreme Court has declared: "The 'body' or identity of a defendant or respondent in a criminal or civil proceeding is never itself suppressible as a fruit of an unlawful arrest, even if it is conceded that an unlawful arrest, search, or interrogation occurred.'" United States v. Ortiz-Hernandez, 427 F.3d 567, 577 (9th Cir. 2005) (citing I.N.S. v. Lopez-Mendoza, 468 U.S. 1032, 1039 (1984)).

**IV. Conclusion**

The Court should deny defendant's motion, as defendant has shown no Fourth Amendment violation.